T.C. Memo. 2012-13

UNITED STATES TAX COURT

JOHN K. AND DANA G. GOYAK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOHN K. GOYAK & ASSOCIATES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12990-07, 13022-07.   Filed January 11, 2012.

<u>Mark D. Allison</u> and <u>Kenneth M. Barish</u>, for petitioners.

<u>Alexander D. Devitis</u>, <u>Anne W. Durning</u>, <u>Roger P. Law</u>, and
<u>Vanessa M. Hoppe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  With respect to John and Dana Goyak (Mr. and
Mrs. Goyak), respondent determined deficiencies in Federal income
taxes of $966,155, $1,848,500, and $1,217,910 for tax years 2002,

2003, and 2004 respectively. Respondent also determined penalties under section 6662[1] of $193,231, $369,700, and $243,582 for 2002, 2003, and 2004, respectively, as well as an addition to tax under section 6551(a)(1) of $42,742 for 2002.

With respect to John K. Goyak & Associates, Inc. (Goyak & Associates), respondent separately determined deficiencies in Federal income taxes of $199,503, $262,692, $297, $374,137, $276,571, and $556,223 for tax years 1997, 1998, 1999, 2000, 2001, and 2002, respectively. Respondent also determined penalties under section 6662 of $55,314 and $111,245 for 2001 and 2002, respectively, as well as additions to tax under section 6551(a)(1) of $1,995, $11,820, $74, and $41,486 for 1997, 1998, 1999, and 2001, respectively.

These cases were consolidated for trial. As a result of settlements between the parties, all issues in taxable years other than 2002 have been resolved. The only remaining issues relate to a $1.4 million contribution Goyak & Associates paid in 2002 to the Millennium Multiple Employer Welfare Benefit Plan (Millennium Plan), a purported section 419A(f)(6) welfare benefit fund. The issues remaining for decision are:

(1) Whether Goyak & Associates may deduct the $1.4 million paid to the Millennium Plan under sections 162(a), 404(a)(5),

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

419, and 263.  We hold that Goyak & Associates may not deduct the payment, as it is not an ordinary and necessary business expense under section 162(a);

(2)  whether the $1.4 million paid to the Millennium Plan is taxable to Mr. Goyak, as either a constructive dividend under section 301 or nonqualified deferred compensation under section 402(b).  We hold that the $1.4 million payment is taxable to Mr. Goyak as a constructive dividend; and

(3)  whether Mr. and Mrs. Goyak and Goyak & Associates (collectively, petitioners) are liable for 20-percent accuracy-related penalties under section 6662.  We hold that they are.

FINDINGS OF FACT

At the time their petition was filed, Mr. and Mrs. Goyak resided in Nevada.  Goyak & Associates is a Nevada corporation which had its principal place of business in Nevada at the time its petition was filed.

1.  Background of Petitioners and Their Advisers

Since its incorporation in 1997, Goyak & Associates has engaged in the business of consulting with defense contractors. Mr. Goyak owned 60 percent of the stock of Goyak & Associates during 2002 and was the president and chief executive officer. Mrs. Goyak owned the remaining 40 percent of the stock and was the primary manager of the financial affairs of Goyak & Associates until the end of 2002.

Before organizing Goyak & Associates, Mr. Goyak earned an undergraduate degree in English and a master's degree in English literature. He also completed most of the work towards a Ph.D. in criticism. During the course of his studies, he never took classes in accounting or tax. After leaving his Ph.D. program Mr. Goyak worked at Lockheed Martin for approximately 8 to 9 years, primarily in the business development area. He also served as vice president of planning and vice president of energy programs at SM&A Corp., an aerospace defense consulting firm.

On account of Mr. Goyak's efforts, the revenue of Goyak & Associates grew from $350,000 to over $5 million per year. After adjusting for disallowed deductions (both those already settled and those decided in this opinion), Goyak & Associates had retained earnings and profits of over $4 million at the end of 2002. In 2002 Goyak & Associates employed Mr. and Mrs. Goyak and two other individuals. During that year Mr. Goyak traveled extensively and billed nearly 3,000 hours, for which he received compensation of $1 million. Goyak & Associates has never paid a dividend to its shareholders.

Despite the rapid growth in business, Goyak & Associates was run as a "Mom and Pop" company until the latter part of 2002. The books of the company became deficient, and tax returns for 1997 through 2001 were not filed until November 2002. Many of Mr. and Mrs. Goyak's personal tax returns were also filed years

late.  Mr. and Mrs. Goyak each participated in the ClassicStar Mare Lease Program, as a result of which they claimed millions of dollars in farming expense deductions in 2001 and reported no Federal tax liability for that year.

In mid-2002 Mr. and Mrs. Goyak were introduced to representatives of Private Consulting Group (PCG).  Mr. Goyak understood that PCG had provided counsel to some of the 400 wealthiest families in the United States.  Two of the PCG representatives who met Mr. Goyak were Bob Holt (Mr. Holt) and Gary Thornhill (Mr. Thornhill).  Mr. Holt managed a PCG office and did financial planning while Mr. Thornhill specialized in insurance.  Mr. Thornhill had sold 17 section 419 welfare benefit plans since 1989.  Neither Mr. Holt or Mr. Thornhill had significant experience with tax issues.

In July 2002 Mrs. Goyak contacted Mr. Holt seeking assistance in resolving Goyak & Associates' financial issues. Mr. Thornhill was brought into the meetings to discuss insurance planning.  By the end of 2002 Mr. Thornhill and Mr. Holt had entered into a consulting arrangement with Goyak & Associates to serve as financial advisers.  Mr. Thornhill also introduced Mr. Goyak to David Lieberman (Mr. Lieberman).  Mr. Lieberman was an accountant and was hired by Goyak & Associates as a consultant in late 2002 to get its records in order.  In July 2003 Mr. Lieberman became Goyak & Associates' full-time chief financial

officer (CFO).  Before coming to work for Goyak & Associates, Mr. Lieberman had performed no tax planning work and had not specialized in tax return preparation, although he had done some small tax returns.

2.  <u>Background and Operation of the Millennium Plan</u>

    A.  <u>History and Structure of the Millennium Plan</u>

The Millennium Plan was established on November 1, 2002, as a purported section 419A(f)(6) welfare benefit plan.  In short the Millennium Plan provides certain benefits to covered employees, such as death, medical, and involuntary severance benefits.  The Millennium Plan was sponsored by the Millennium Marketing Group (MMG).  The Millennium Plan grew to 531 covered employees representing over 300 employers at the end of 2005; however, the number of covered employees contracted to 459 by the end of 2008.

Before establishment of the Millennium Plan, Kathleen Barrow (Ms. Barrow) and her law firm, Karger, Key, Barnes & Lynn, P.C., were retained to provide legal advice, including advice regarding section 419A(f)(6).  Ms. Barrow drafted the core operating documents of the Millennium Plan, including the Millennium Plan Master Plan (master plan), which is the core operating document, and the Guidelines for Claims Administration (plan guidelines).  Ms. Barrow continued to act as outside counsel for the Millennium Plan after its establishment.  On June 1, 2004, Ms. Barrow became

the president and chief counsel of MMG and was employed by MMG in this capacity until July 31, 2006. After leaving her position as president and chief counsel, Ms. Barrow continued to provide consulting services to the Millennium Plan.

Republic Bank & Trust (Republic Bank) in Norman, Oklahoma, has served as the trustee of the Millennium Plan from the plan's inception to the present. As trustee, Republic Bank holds the Millennium Plan's assets for the benefit of the plan's participants and keeps certain records. Other records were kept by the plan's third-party administrator (TPA), who made the initial decisions on benefit requests. Another company had served as the initial TPA but was terminated in 2005 following an audit. SecurePlan Administrators, LLC (SecurePlan), was the successor TPA and is the current TPA of the Millennium Plan. SecurePlan is an operating subsidiary of Republic Bank, the plan's trustee.

Both the TPA and the trustee of the Millennium Plan are directed by the Millennium Plan's Plan Committee (plan committee) which has been functional since the beginning of 2004. The plan committee functions like a corporate board of directors and is the governing body of the Millennium Plan. It consists of certain participating employers acting as nonpaid voting members. Since at least 2008 the plan committee has also had a nonvoting chairman who is employed and paid by the Millennium Plan. The

primary duties of the plan committee are to ensure the Millennium Plan complies with section 419A(f)(6) and related regulations and to hear benefit appeals from plan participants. The plan committee also reviewed a small portion of requests to withdraw from the Millennium Plan by "voiding" (discussed further below) before 2008.

MMG retained Milliman USA (Milliman) for actuarial assistance with the Millennium Plan. Milliman is one of the largest actuarial firms in the United States and is not related to the Millennium Plan or MMG. Milliman has served as the Millennium Plan's actuary from 2002 to the present. Milliman assisted in the creation of participant risk pools, otherwise known as rating groups, with the goal of compliance with the requirements of section 419A(f)(6) and the regulations thereunder.

B. Entering the Millennium Plan

Participants enter the Millennium Plan in one of two ways: they transfer in from another purported section 419A(f)(6) plan or they become new covered employers. To qualify to participate in the Millennium Plan, an employer must be an S or C corporation, a limited liability partnership, a limited liability company, a partnership, a professional corporation, or an association under State laws applicable to them. A qualifying employer adopts the Millennium Plan by resolving to adopt the

plan, executing and delivering an adoption agreement to the TPA, and paying a contribution to the plan.

An employer chooses the employees to be covered by the Millennium Plan and the amounts of the contributions it wishes to make to the plan on behalf of any covered employees, with some restrictions. The amount of the initial contribution determines, in part, the amount of benefits each covered employee is eligible for. Employers also choose from a menu of insurance products that Milliman had determined were appropriate for the plan, essentially choosing their level of risk. The employer also selects an insurance company from which the Millennium Plan will purchase a life insurance policy on each covered employee.

When employers enter the Millennium Plan, the trustee seeks to procure an insurance policy on the life of the new covered employee(s) comporting with the investment choices made by the employers. The employees are assigned to rating groups with other covered employees of similar insurance risks. The trustee holds the insurance policy as an asset of the Millennium Plan which can be borrowed against to provide cash. The trustee is also authorized to purchase various securities.

The employee and employer purportedly have no interest in the insurance policy or plan assets; they are entitled to receive benefits from the Millennium Plan only upon the occurrence of a triggering event (such as the death or disability of a covered

employee).  If a policy cannot be procured on an employee's life, the employer's contribution, minus an administrative fee, is returned to the employer, and the employee is not able to participate in the Millennium Plan.

C.  <u>Millennium Plan Benefits Overview</u>

The Millennium Plan provides death and life benefits to covered employees.  Death benefits are payable upon the employee's death to a beneficiary or beneficiaries designated by the covered employee.  Since 2004 the plan has also provided covered employees certain life benefits such as medical and involuntary severance benefits.  The amount of both death and life benefits available to a covered employee is calculated annually and is affected by the benefits claimed by other covered employees within the same rating group and by changes in value of Millennium Plan assets (mostly changes in the cash values of the life insurance policies held by the plan).

The amount of death benefits payable upon the death of a covered employee is reduced by the accumulated amount of any life benefits claimed by that covered employee during the employee's lifetime; this reduction is calculated only upon the death of a covered employee.  The amount of the reduction in death benefits is forfeited to the Millennium Plan upon the death of the covered employee.

Life benefits are purportedly paid only upon the occurrence of certain triggering events. Although the Millennium Plan did not make life benefits available to covered employees until 2004, the triggering events for life benefits to be paid have been listed in each version of the plan guidelines. From 2002 to 2005 the triggering events listed in the plan guidelines were amended several times. No further changes were made after those effective for 2005. The original master plan was effective November 1, 2002, with amended master plans becoming effective March 1, 2003, January 1, 2004, and January 1, 2005. The plan guidelines also contained provisions applying to payment of benefits. The original plan guidelines became effective January 1, 2003, with amended plan guidelines becoming effective September 1, 2003, January 1, 2004, and January 1, 2005.

Under section 5.03 of each of the four versions of the plan guidelines, life benefits could be claimed upon involuntary severance of the covered employee, the employer's withdrawal from the Millennium Plan, termination of the employee's participation in the Millennium Plan by the TPA, or termination of the Millennium Plan as a whole. Each version of the plan guidelines provided that involuntary severance life benefits could be claimed "in the event of the Covered Employers bankruptcy, insolvency, corporate dissolution or change of control of the Covered Employer as defined by the controlling employment

agreement." If a life benefit was claimed as a result of employer withdrawal from the Millennium Plan, a life benefit was not paid to the covered employee but could be transferred to another welfare benefit plan or trust in accordance with section 419A(f)(6).

The March 1, 2003, version of the plan guidelines allowed a life benefit to be claimed for reimbursement of tax-qualified medical expenses or claimed in the case of certain financial hardships such as eviction or payment of tax-qualified education costs. The final two versions of the plan guidelines removed the provision relating to financial hardship. No hardship benefits were ever paid as the hardship provision was active only during 2003 when the Millennium Plan did not pay out life benefits.

If a covered employee in the Millennium Plan experiences a life benefit triggering event, the employee can submit a claim to the plan to receive life benefits. According to plan rules, the covered employee must support his or her claim with documentary evidence establishing that he or she experienced a triggering event. The TPA initially reviews claims for benefits. For claims for involuntary severance or disability, the TPA immediately involves the plan committee chairman, who may then consult with other members of the plan committee, to help determine whether a life benefit should be paid. Should the TPA deny a claim for life benefits, the claimant may appeal that

decision to the plan committee.  Should the plan committee affirm the decision of the TPA, the only remaining option available to the claimant would be to file a lawsuit.

D.  Transfers and Void Transactions

The Millennium Plan allows participants to transfer to other welfare benefit plans.  Less than a dozen transfers from the Millennium Plan have been approved, while a few other transfer requests have either been rejected or failed to complete the process.  For every covered employee going to a new plan, the insurance policy held by the Millennium Plan on the life of that covered employee is transferred to the new plan.  The death benefits of the transferred policy is either equal to or nearly equal to the death benefits that the covered employee had in the Millennium Plan, and the cash value of the policy is equal to the covered employee's remaining life benefit in the Millennium Plan for the year.

Certain rules governed transfers from the Millennium Plan. Each version of the plan guidelines listed similar requirements for plan transfers, including:  (1) The transferee plan must be "another employee welfare benefit plan under Code §§ 419 or 419A"; (2) the transfer must not result in a reversion of Millennium Plan assets to the employer or a distribution to the covered employees; and (3) the plan committee must receive documentation that the various requirements are satisfied.

Additional requirements designed to protect the Millennium Plan's status under section 419A(f)(6) were included in plan committee rules approved June 21, 2006.

In addition to transfers, until 2008 employers were able to "void" their participation in the Millennium Plan. A void transaction is one in which the plan transaction is unwound retroactive to the date the employer became a participant in the Millennium Plan. Such an action is different from a mere withdrawal or transfer from the Millennium Plan.

Upon a transaction's being voided, the insurance policy on the life of any covered employees would be distributed to either the employer or to the covered employees as indicated by the employer. It appears that no adjustments were made to reduce the cash value of the policy distributed to match the cash value of the policy at the time the participant entered the Millennium Plan; nothing stating that such a reduction would occur appeared in the letters sent to participants who requested their participation be voided or in the communications between the Millennium Plan and the plan trustee. In addition, when the request for a void transaction had been completed by the participating employer, communications among the employer, the trustee, and the Millennium Plan provided that "all Plan assets" purchased with the employer's contribution(s) would be distributed back to the employer or the employee(s).

Voiding is purportedly allowed only when the employer fails to complete the enrollment, because of mutual mistake of fact, or because of a misrepresentation by an employer's adviser regarding benefits and features of the Millennium Plan in connection with the employer's decision to participate.  In addition, employers who voided their transactions were required to sign a statement that they would amend any tax returns affected by their participation in the plan, consistent with the voiding of the plan transaction.

Around 30 employers representing approximately 50 covered employees were allowed to void their transactions after they had completed the enrollment process, entered the Millennium Plan, and had their covered employees assigned to a rating group.  Some employers had been participating in the Millennium Plan for years at the time their transactions were voided.  In addition, some employers were allowed to void their participation after their covered employees had received life benefit payments from the plan, although if they did so the life benefits previously paid to the covered employee were required to be reimbursed to the plan.

The plan committee was initially unaware of the extent to which void transactions were occurring.  The plan committee had reviewed only a very small number of void transaction requests. The actual number of void transactions occurring did not come to

the attention of the plan committee until the third quarter of 2007. It became obvious to the plan committee that there was a significant breakdown in the plan's governance rules and a breach of its internal controls. Although the plan committee had been unaware of the extent of the void transactions, communications from 2005 and 2006 make it clear that Republic Bank and the Millennium Plan itself (including Ms. Barrow, the president and chief counsel of MMG at the time) were well aware of the extent of void transactions occurring. In January 2008 the plan committee adopted a policy ceasing to allow void transactions going forward.

3. Petitioners' Participation in the Millennium Plan

Mr. Thornhill attended numerous training sessions to learn about the Millennium Plan, although he was not employed by it and never had a role in its operation or management. The training sessions were conducted by MMG. Mr. Thornhill also contacted Ms. Barrow and spoke to her on several occasions about the Millennium Plan and how it was different from other purported section 419A(f)(6) plans. He had Ms. Barrow meet with Richard Smith (Mr. Smith) and Tom Handler (Mr. Handler). Both Mr. Smith and Mr. Handler were lawyers familiar with other purported section 419A(f)(6) plans, and Mr. Handler's firm did legal work for PCG. Mr. Handler attended an initial meeting between Mr. and Mrs.

Goyak and Mr. Thornhill; Mr. Handler would also later do other tax work for petitioners.

Petitioners were introduced to the Millennium Plan by PCG, Mr. Thornhill, and Mr. Holt. Mr. Thornhill told Mr. Goyak that contributions to the plan were deductible to the corporation and that it was a tremendous way to accumulate post- and pre-retirement benefits. Mr. Goyak was also told that the plan would provide substantial tax-free retirement income to him and his wife while they were still alive, which he liked because he was setting his company up so that he could retire when he chose to. Mr. Goyak also liked that the Millennium Plan was asset protected and divorce-proof.

Mr. Thornhill gave a presentation to Mr. Goyak detailing some aspects of the Millennium Plan. One of the sheets in the presentation, entitled "If You Keep Doin' What You're Doin'", details how a taxable investment of $466,667 for each of 3 years would perform over the next 15 years. The sheet indicates that at the end of 15 years the investment would have a balance of $1,683,810. The next sheet is entitled "If You Implement The Millennium Plan" and details the results of using a tax-deductible contribution to the Millennium Plan over 15 years. The sheet indicates that at the end of 15 years the cash value of the insurance policy in the plan would be $2,647,887.

On the basis of their analysis and the financial condition of Goyak & Associates at the end of 2002, Mr. Lieberman, Mr. Thornhill, and Mr. Holt ultimately determined that Goyak & Associates could afford to make a $1.4 million contribution to the Millennium Plan. Mr. Goyak did not know how the amount of the contribution was determined. In December 2002 Mr. Goyak signed documents that approved the adoption of the Millennium Plan by Goyak & Associates, including an adoption agreement and corporate resolution. Mr. Goyak was the only employee of Goyak & Associates who would be covered by the Millennium Plan.

Goyak & Associates made the $1.4 million contribution to the Millennium Plan on December 30, 2002, and selected the life insurance policy to be issued on Mr. Goyak's life. In addition to the $1.4 million contribution, Goyak & Associates agreed to pay the Millennium Plan a $2,500 annual administration fee for as long as it participated in the plan. On July 12, 2003, an insurance policy was issued on Mr. Goyak's life from American General Life Insurance Co. (American General). Mr. Thornhill and PCG were in contact with American General before the policy was issued, seeking to get favorable terms on the policy and also to have the policy backdated to December 2002. The face amount of the policy was $8,221,752, and it required three annual premiums of $466,667, which were paid by the Millennium Plan. Mrs. Goyak was designated beneficiary of Mr. Goyak's death benefits paid

from the Millennium Plan, although a trust for the Goyak family was made the beneficiary in January 2004.

The policy on Mr. Goyak's life had a cash surrender value that could be collected by the policyholder should he or she terminate the policy. The cash surrender value of the policy on Mr. Goyak's life was increased each time a premium was paid on the policy. It was also increased by an interest rate which was guaranteed to be at least 2 percent per year.

Once the policy was issued and Mr. Goyak became a covered employee, he was eligible for any available life benefits retroactive to the signing of the adoption agreement. Mr. Thornhill received a commission from American General in connection with the purchase of the policy; however, the amount he received was less than what he otherwise would have received had the same policy been purchased by Mr. Goyak or Goyak & Associates directly instead of by the Millennium Plan.

Other than the death benefits, Mr. Goyak did not know what benefits he was entitled to as a participating employee in the Millennium Plan. At the time of trial he had never made a claim for benefits from the plan; indeed, he did not know how to claim benefits. From 2003 to 2009 Mr. Goyak's death benefits increased from $8,221,758 to $9,521,678, and from 2004 to 2009 his life benefits increased from $557,718 to $1,184,444, reaching a high of $1,490,515 for 2008.

Mr. Goyak never interacted directly with representatives of the Millennium Plan, instead always going through his advisers. Mr. Goyak did not know what a section 419A(f)(6) plan was either at the time Goyak & Associates entered into the Millennium Plan or at trial. Mr. Goyak never expressed to Mr. Thornhill any concerns about the tax aspects of the Millennium Plan; instead, Mr. Goyak deferred to and relied upon the financial knowledge of Mr. Thornhill and Mr. Holt as financial professionals. Mr. Lieberman provided no advice to Mr. Goyak about Goyak & Associates' participation in the Millennium Plan other than helping to determine the amount Goyak & Associates could afford to contribute. Neither in 2002 nor at trial did Mr. Lieberman know how section 419A(f)(6) plans worked or how the Millennium Plan was designed, operated, or managed.

In 2002 before Goyak & Associates made the contribution to the Millennium Plan, Mr. Thornhill recommended that Mr. Goyak seek outside legal advice. Mr. Thornhill also sent a letter to all PCG clients participating in the Millennium Plan in April 2005 which stated that "it cannot be stressed enough to discuss * * * [the Millennium Plan] with your tax adviser to determine the appropriate course of action for you." In addition, Goyak & Associates received documents from the Millennium Plan stating that participation in the plan involved certain tax risks,

especially when only one owner/employee of a business was being covered (as was the case in Mr. Goyak's situation).

Mr. Goyak did not seek outside legal advice about the Millennium Plan, although he knew Mr. Handler was aware of the Millennium Plan through his association with PCG. While it appears Mr. Goyak believed that Mr. Handler would have warned him about the Millennium Plan had it been risky, there is no evidence that Mr. Goyak ever asked Mr. Handler about the Millennium Plan. In addition, no evidence was supplied that Mr. Handler was ever aware that Goyak & Associates was contemplating entering or had entered the Millennium Plan, even when Mr. Handler was doing tax work for petitioners after 2002.

After becoming a covered employee in the Millennium Plan, Mr. Goyak received a Plan Administration Manual, which included a summary of a legal opinion provided by Ms. Barrow on the tax qualification issues arising in connection with the Millennium Plan. Ms. Barrow's opinion had concluded that the Millennium Plan complied with section 419A(f)(6) and the regulations thereunder. In addition, the Millennium Plan sent instructional materials to participating employers stating that they should pay heed to section 162 issues and recommending that they get advice and comparable reports on compensation and other items.

On a June 29, 2006, conference call among Ms. Barrow, Mr. Goyak, Mr. Lieberman, and Mr. Thornhill, Mr. Lieberman asked

about Mr. Goyak's collecting severance benefits when he could not get fired from the business he and his wife entirely owned. Ms. Barrow and Mr. Thornhill replied that a significant corporate event could cause Mr. Goyak to qualify for severance benefits and that corporate clients could "time" the event for tax-planning purposes.

4. Other Information

Goyak & Associates dismissed Mr. Holt and Mr. Thornhill when it could no longer afford their services. Mr. Lieberman left Goyak & Associates in 2006 to become CFO and chief operating officer of another company. Mr. Goyak has initiated a civil action in Nevada against PCG, MMG, Mr. Thornhill, Mr. Holt, and Mr. Lieberman as a protective measure given the uncertainty in how these cases would be decided.

On March 5, 2007, respondent issued a notice of deficiency to Goyak & Associates for tax years 1997 through 2002 and a notice of deficiency to Mr. and Mrs. Goyak for tax years 2002 through 2004. Petitioners timely filed their petitions contesting the deficiencies, additions to tax, and penalties.

As of the time of trial, Mr. Goyak remained a participating employee in the Millennium Plan.

5. Expert Witness

Charles DeWeese (Mr. DeWeese) was admitted as an expert witness for petitioners. Mr. DeWeese has extensive experience

with section 419A(f)(6) plans and has previously testified for respondent in other Tax Court cases involving section 419A(f)(6) plans where we found his testimony to be reliable, relevant, and helpful. Since April 2004 Mr. DeWeese has worked for MMG serving in an advisory capacity to the Millennium Plan. He has never had an operational role in or an advocacy role for the plan. Mr. DeWeese testified at trial and submitted an expert report which was accepted into evidence.

In preparing his report, Mr. DeWeese reviewed Millennium Plan claim files. During this review, Mr. DeWeese wrote down many of his concerns regarding certain life benefits which had been paid by the plan to covered employees. In particular, Mr. DeWeese had several concerns regarding severance claims which had resulted in benefit payouts from the plan. Mr. DeWeese was concerned because several claims had been paid out when the claim file lacked documentation that the severance was involuntary. In one case Mr. DeWeese was also concerned because the covered employee was the sole employee of an employer who was going out of business.

After reviewing the claims files, Mr. DeWeese had a conversation with Ms. Barrow about his concerns, some of which she was able to resolve. Mr. DeWeese testified that he was satisfied that the Millennium Plan "had the will to manage their claims appropriately." Mr. DeWeese's report concluded that the

Millennium Plan met the requirements of section 419A(f)(6).  His conclusion was based in part on his "understanding that life benefits are paid only on properly investigated legitimate claims".

Mr. DeWeese testified that he considered it "troublesome" and "inappropriate" for covered employees to void their participation in the Millennium Plan years after enrollment or after they had received payment of life benefits.  It appears Mr. DeWeese was not aware of the extent to which void transactions were being used as a way to exit the Millennium Plan at the time he prepared his report, only learning of such facts afterwards.

OPINION

## I.  Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions.  Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Petitioners have not argued that respondent should bear the burden of proof in these cases.

II.  Deductibility of Contributions Made to Section 419A(f)(6)
     Welfare Benefit Funds in General

Section 419(a) provides that an employer's contributions to a welfare benefit fund are deductible but only if they are otherwise deductible under chapter 1 of the Code.  The deductibility of an employer's contributions to a welfare benefit fund is further limited by section 419(b) to the fund's qualified cost for the taxable year.  However, section 419A(f)(6) provides that contributions paid by an employer to a welfare benefit fund which is part of a "10 or more employer plan" are not subject to the deduction limitation of section 419(b).

Petitioners argue that (1) contributions to the Millennium Plan are ordinary and necessary business expenses deductible under section 162(a) (which is in chapter 1 of the Code), and (2) the Millennium Plan is a "10 or more employer plan" under section 419A(f)(6), so that the deduction limits of section 419(b) are not applicable.

Respondent argues that Goyak & Associates' $1.4 million contribution to the Millennium Plan is not deductible under section 162(a) as an ordinary and necessary business expense and that the contribution was made for the personal benefit of Mr. and Mrs. Goyak.  As a result, respondent claims the $1.4 million should be included in Mr. and Mrs. Goyak's gross income as a constructive dividend.  Respondent alternatively claims that Goyak & Associates is not entitled to the claimed $1.4 million

deduction because the Millennium Plan is a nonqualified deferred compensation arrangement under section 404(a)(5).  Respondent further claims that if this contribution was not a dividend or nonqualified deferred compensation, the Millennium Plan constituted a welfare benefit fund under section 419(e), and thus the $1.4 million deduction is subject to the limits (based on the fund's qualified cost) imposed by section 419(b) and that the exception to those limits provided in section 419A(f)(6) did not apply.  Finally, respondent claims that even if the Millennium Plan qualified as a section 419A(f)(6) plan, the contribution from Goyak & Associates was a nondeductible capital expenditure under section 263.

For the reasons stated below, we find that the contribution Goyak & Associates made to the Millennium Plan is not an ordinary and necessary business expense under section 162(a).  We therefore hold that Goyak & Associates may not deduct the $1.4 million contribution paid to the Millennium Plan in 2002 and that the $1.4 million should instead be treated as a constructive dividend paid to Mr. Goyak.

III.  <u>Whether Goyak & Associates' Contribution to the Millennium Plan Is an Expense Deductible Under Section 162(a) or a Constructive Dividend Paid to Mr. Goyak</u>

We have found that Goyak & Associates' $1.4 million contribution to the Millennium Plan is not an ordinary and necessary business expense deductible under section 162(a).  Our

decision turns on our conclusion that covered employees in the plan were able to (1) freely void their participation in the plan and have the life insurance policy distributed to them, or (2) receive life benefits at a time of their choosing by "timing" a severance event.  Participating employers funneled their pretax business profits into the Millennium Plan to claim tax deductions and covered employees were able to functionally withdraw those amounts at a later time of their choosing.  As a result, Goyak & Associates' contribution to the Millennium Plan should be considered a constructive dividend paid to Mr. Goyak, rather than an ordinary and necessary business expense under section 162(a).

As a preliminary matter, we note that under the annual accounting system of Federal income taxation, the amount of income tax payable for a taxable year is generally determined on the basis of those events happening or circumstances present during that tax year.  Curcio v. Commissioner, T.C. Memo. 2010-115; Hubert Enters., Inc. v. Commissioner, T.C. Memo. 2008-46.  Although the Millennium Plan has altered its rules multiple times since 2002, we base our finding on the operation of void transfers as they existed unchanged from 2002 to the third quarter of 2007 and on the operation of severance life benefit payouts, which remained the same from 2002 onward.

Section 162(a) provides a deduction for ordinary and necessary expenses paid or incurred during the taxable year in

carrying on a trade or business. A taxpayer must meet five requirements in order to deduct an item under this section. The taxpayer must prove that the item claimed as a deductible business expense: (1) Was paid or incurred during the taxable year; (2) was for carrying on his, her, or its trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense. See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971); Welch v. Helvering, 290 U.S. 111, 113-115 (1933). Whether an expenditure satisfies each of these requirements is a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

Purchasing insurance for the benefit of an employee is, in many circumstances, an ordinary and necessary business expense deductible under section 162(a). See Curcio v. Commissioner, supra; Frahm v. Commissioner, T.C. Memo. 2007-351. However, we have held that when employers make contributions to purported section 419A(f)(6) plans and covered employees can receive the value reflected in insurance policies purchased by those plans, those contributions made by employers are not deductible under section 162(a). Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 90-92 (2000) ("The parties * * * have always expected and understood that the conversion credit balance would be returned to the insured in the future * * *. * * * we are convinced that the purpose and operation of the Neonatology Plan

and the Lakewood Plan was to serve as a tax-free savings device for the owner/employees"), affd. 299 F.3d 221 (3d Cir. 2002); V.R. Deangelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360 ("we decide on the basis of the credible evidence in the record before us that * * * [covered employees] investing in the STEP plan had the primary right to receive the value reflected in the insurance policies written on their lives"), affd. 574 F.3d 789 (2d Cir. 2009); Curcio v. Commissioner, supra ("Our decision turns on our factual findings regarding the mechanics of Benistar Plan and our conclusion that petitioners had the right to receive the value reflected in the underlying insurance policies purchased by Benistar Plan. Petitioners used Benistar Plan to funnel pretax business profits into cash-laden life insurance policies over which they retained effective control.").

Like employees covered by the plans at issue in Neonatology, Curcio, and Deangelis, covered employees were able to receive the value reflected in insurance policies held by the Millennium Plan. They could receive the policies themselves by having their employers void their participation in the Millennium Plan, or they could receive payouts from the Millennium Plan by timing corporate events which would cause the Millennium Plan to pay them severance life benefits.

A.  Void Transactions

In a void transaction the covered employee (if indicated by
the employer) was able to obtain "all Plan assets" purchased by
the Millennium Plan as a result of his or her employer's
contribution(s).  In their brief, petitioners claim that voiding
was allowed only when the employer failed to complete the
enrollment, because of mutual mistake of fact, or because of a
misrepresentation by an employer's adviser regarding benefits and
the features of the Millennium Plan in connection with the
employer's decision to participate.  While this may have been the
theoretical rule, in practice voiding was allowed almost freely
before the third quarter of 2007.  At that time the plan
committee realized that a significant breakdown in the Millennium
Plan's governance rules and a breach of its internal controls had
occurred with regard to void transactions.  Before this
realization, the plan committee had reviewed very few of the
requests for a void transaction.  However, the plan trustee and
the Millennium Plan itself had been fully aware of the extent to
which void transactions were being used to exit the Millennium
Plan.  No explanation was provided by petitioners regarding why
the plan committee was not informed of the extent of void
transactions.

The impropriety of the extent of the voiding which occurred
in the Millennium Plan is further emphasized by the fact that

some employers had been participating in the Millennium Plan for years at the time their transactions were voided. In addition some employers were allowed to void their participation after their covered employees had received life benefit payments from the Millennium Plan (although they did have to return any prior life benefits paid to them before voiding). The fact that the Millennium Plan would approve void requests in such circumstances underlines the minimal amount of regard paid to the plan voiding rules (which were designed to comply with the Code). Even petitioners' expert Mr. DeWeese recognized that it was "troublesome" and "inappropriate" that employers were able to void their participation in the plan years after enrollment or after their covered employees had received payment of life benefits.

Petitioners point out that participants voiding their transactions were required to sign a statement that they would amend any tax returns affected by their participation in the plan, consistent with the voiding of the plan transaction. Petitioners therefore claim it would be impossible for participants to gain by voiding their transactions, as all deductions previously claimed would be lost as a result of the amended returns. However, petitioners presented no evidence that the Millennium Plan or MMG enforced or checked on the amendment of tax returns in any way after receiving participants'

signatures stating that the participants would amend their returns. Even if a participant did amend a return after voiding, that participant could still benefit if the plan assets returned to the participant upon voiding had appreciated in value over the amount of the (initially) tax-free contributions made to the Millennium Plan, as the appreciation would have occurred on a tax-free amount rather than an amount reduced by taxes.

B. Severance Life Benefits

Under each of the four versions of the plan guidelines, life benefits could be claimed upon involuntary severance of the covered employee from the employer. Each version of the plan guidelines provided that involuntary severance life benefits could be claimed "in the event of the Covered Employers bankruptcy, insolvency, corporate dissolution or change of control of the Covered Employer as defined by the controlling employment agreement."

We believe that severance benefits were paid upon events which did not amount to involuntary severance. We note that on a June 29, 2006, conference call among Ms. Barrow, Mr. Goyak, Mr. Lieberman, and Mr. Thornhill, Mr. Lieberman asked about Mr. Goyak's collecting severance benefits when he could not get fired from the business which he and his wife entirely owned. Ms. Barrow and Mr. Thornhill replied that a significant corporate event could cause Mr. Goyak to qualify for severance benefits and

that corporate clients could "time" the event for tax-planning purposes.

We also note that Mr. DeWeese expressed concern because several claims for life benefits on account of involuntary severance had been paid when the claim file lacked documentation that the severance was involuntary. In one case Mr. DeWeese was also concerned because the covered employee was the sole employee of an employer who was going out of business. Although Mr. DeWeese testified that when he discussed his concerns with Ms. Barrow she was able to ease some of them, we believe his concerns are evidence that the Millennium Plan was in fact allowing participating employers to time payment of severance life benefits to their covered employees, just as Ms. Barrow said Goyak & Associates would be able to do.

C.  Other Evidence of Covered Employee Access to Plan Assets

Other facts reinforce our belief that the Millennium Plan served as a tax-free savings device for the employees participating in it. We have previously considered the amount of risk-sharing in a plan, the amount of control participating employers had in choosing their policy, and other facts similar to those noted below when making a section 162(a) determination regarding contributions made to a purported section 419A(f)(6) welfare benefit fund. See, e.g., Curcio v. Commissioner, T.C.

Memo. 2010-115; <u>V.R. Deangelis M.D.P.C. v. Commissioner</u>, T.C. Memo. 2007-360.

We first note that the amount of death benefits payable upon the death of a covered employee was reduced by the accumulated amount of any life benefits claimed by that employee during his or her lifetime.  This fact acted to preserve the assets of each covered employee separately and insulated covered employees from changes in their benefit levels on account of benefits' being claimed by other participating employees within their rating group.  If another participating employee claimed life benefits, those life benefits were forfeited back to the plan upon the death of the claiming employee, lessening (or negating) the impact that the prior life benefit payout would have on other employees in the same rating group.

We next note that participants entering the Millennium Plan choose from a menu of insurance products from several insurance companies, essentially choosing their level of risk.  The participating employers also choose the amount to contribute to the Millennium Plan.  Furthermore, Mr. Goyak's advisers were able to directly negotiate the terms of the insurance policy with American General and sought to have the insurance policy on Mr. Goyak's life backdated to December 2002.

We also note that at the time Goyak & Associates entered the Millennium Plan, Mr. Goyak was setting his company up with an eye

toward retirement and entered the plan under the assumption that it would provide substantial tax-free retirement income to Mr. and Mrs. Goyak while they were still alive. Before Goyak & Associates entered the plan, Mr. Thornhill had given a presentation to Mr. Goyak, part of which compared how a taxable investment would perform against the effect tax-deductible contributions to the Millennium Plan would have on the cash value of an insurance policy.

D. Conclusion Regarding Deductibility Under Section 162(a) and Effect on Constructive Dividend Issue

We have found the $1.4 million contribution Goyak & Associates made to the Millennium Plan in 2002 is not an ordinary and necessary business expense deductible under section 162(a) because of the access which plan participants had to plan assets. Because the $1.4 million contribution was not a deductible business expense under section 162(a) and conferred an economic benefit on Mr. Goyak for the primary (if not sole) benefit of Mr. Goyak, we conclude that the contribution was a constructive distribution paid from Goyak & Associates to Mr. Goyak.[2] See

---

[2]Petitioners have not argued that Goyak & Associates should be entitled to deduct the costs of the current life insurance protection purchased through the Millennium Plan, nor have they identified evidence that would enable us to establish that cost. As a result, we find that no part of the contribution to the Millennium Plan is deductible by Goyak & Associates. See Curcio v. Commissioner, T.C. Memo. 2010-115; V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, affd. 574 F.3d 789 (2d Cir. 2009).

Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 91-92;
Curcio v. Commissioner, supra; see also V.R. Deangelis M.D.P.C.
v. Commissioner, supra.

We next address whether the constructive dividend income
should be taxable to Mr. Goyak as ordinary income, nontaxable
return of capital, or gain from the sale or exchange of property.
Section 301 provides that funds distributed by a corporation over
which the taxpayer/shareholder has dominion and control are taxed
under section 301(c).  Barnard v. Commissioner, T.C. Memo. 2001-
242.  Under sections 301(c) and 316(a), distributions are
dividends taxable to shareholders as ordinary income to the
extent of the earnings and profits of the corporation, and any
amount received by a shareholder in excess of earnings and
profits is considered a nontaxable return of capital to the
extent of the shareholder's basis in his stock.  Truesdell v.
Commissioner, 89 T.C. 1280, 1294-1295 (1987).  Any amount
received in excess of both the earnings and profits of the
corporation and the shareholder's basis in his stock is treated
as gain from the sale or exchange of property.  Id.

By the end of 2002 Goyak & Associates had over $4 million of
retained earnings and profits; it therefore had enough earnings
and profits to cover the $1.4 contribution paid for the benefit
of Mr. Goyak.  We therefore hold that the $1.4 million
contribution paid by Goyak & Associates to the Millennium Plan

was a constructive dividend paid to Mr. Goyak, taxable as ordinary income to him.

IV. <u>Whether Petitioners Are Liable for Section 6662 Accuracy-Related Penalties</u>

Respondent determined that petitioners were liable for a 20-percent accuracy-related penalty under section 6662(a) and (b)(1) for negligence or disregard of rules and regulations, or in the alternative, under section 6662(a) and (b)(2) for substantial understatement of income tax. Petitioners contest the imposition of accuracy-related penalties for 2002.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority under section 6664. See Rule 142(a); <u>Higbee v. Commissioner</u>, <u>supra</u> at 446-447. Respondent has met the burden of production by showing that petitioners improperly deducted or failed to report $1.4 million contributed to the Millennium Plan and used the funds to purchase assets for the primary benefit of Mr. Goyak. This evidence is sufficient to indicate that it is appropriate to impose penalties

under section 6662(a).  See, e.g., <u>Curcio v. Commissioner</u>, T.C. Memo. 2010-115.

Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code.  Section 6662(c) also defines disregard as any careless, reckless, or intentional disregard.  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to rules or regulations.  Sec. 1.6662-3(b)(2), Income Tax Regs.  Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists.  <u>Id.</u>  Disregard of rules or regulations is intentional if the taxpayer has knowledge of the rule or regulation that he disregards.  <u>Id.</u>

An underpayment is not attributable to negligence or disregard to the extent that the taxpayer shows that the underpayment is due to the taxpayer's reasonable cause and good faith.  Sec. 6664(c)(1); <u>Neonatology Associates, P.A. v. Commissioner</u>, <u>supra</u> at 98.  Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item.  See <u>United States v. Boyle</u>, 469 U.S. 241 (1985); <u>Estate of Young v. Commissioner</u>, 110 T.C. 297, 317 (1998).  Good-faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may

meet this requirement.  See <u>United States v. Boyle</u>, <u>supra</u>; sec. 1.6664-4(b), Income Tax Regs.  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662 accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  <u>Neonatology Associates, P.A. v. Commissioner</u>, 115 T.C. at 99.  In addition, reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about.  <u>Id.</u> at 98.

We find that petitioners acted both negligently and with at least a careless disregard of rules and regulations.  We also find that the underpayments are not due to petitioners' reasonable cause and good faith.  Mr. Goyak did not make reasonable attempts to comply with the Code or to determine the

correctness of petitioners' tax positions.  In addition, it was unreasonable for Mr. Goyak to rely on those advisers which he did in deciding to enter the Millennium Plan without getting the opinion of an independent attorney or accountant.

We first note that Mr. Goyak is highly educated and intelligent.  Although he was not educated in the areas of tax or accounting, he was an experienced and successful businessman.  In spite of his experience and intelligence, Mr. Goyak choose to rely on advisers who were unfamiliar with tax law or not independent when deciding whether to enter the Millennium Plan. In doing so he ignored repeated warnings, both before and after entering the Millennium Plan, to seek independent legal advice.

While Mr. Lieberman was an independent accountant, he did not have significant tax experience, was not familiar with section 419 plans, and provided Mr. Goyak with no advice on the Millennium Plan other than helping to determine the amount Goyak & Associates could afford to contribute.  Mr. Holt had no significant experience with tax issues, and no evidence was presented that he was familiar with insurance plans or provided advice to Mr. Goyak about entering the Millennium Plan.  Mr. Goyak received a summary of a legal opinion written by Ms. Barrow, but she was not an independent attorney; she acted as a consultant for the plan (and was later employed by MMG) and had drafted its core operating documents.  Although Mr. Goyak did

have Mr. Handler do certain legal and tax work for petitioners, no evidence was presented that they ever discussed the Millennium Plan or that Mr. Handler was aware that Goyak & Associates had entered the Millennium Plan, much less that Mr. Handler gave petitioners his legal opinion regarding contributions made to it.

Petitioners focus largely on the advice provided to Mr. Goyak by Mr. Thornhill. While Mr. Thornhill was an insurance specialist familiar with section 419 plans, he did not have significant experience with tax issues. Mr. Thornhill did have Ms. Barrow meet with Mr. Smith and Mr. Handler (attorneys with section 419 plan experience), but no evidence was presented that either of these attorneys gave Mr. Thornhill an opinion regarding the Millennium Plan. Most importantly, Mr Thornhill told Mr. Goyak both in 2002 and in 2005 that Mr. Goyak should seek outside legal advice concerning the Millennium Plan.

We also note that Mr. Thornhill received a commission from American General in connection with the purchase of the policy on Mr. Goyak's life by the Millennium Plan. This commission undermines petitioners' argument that Mr. Thornhill was an independent adviser. While it is true that Mr. Thornhill's commission was less than the amount he otherwise would have received had the same policy been purchased by Mr. Goyak or Goyak & Associates directly, no evidence was presented that Mr. Goyak ever considered purchasing an insurance policy himself or through

Goyak & Associates. It may be that Mr. Goyak would not have considered purchasing a life insurance policy himself or through Goyak & Associates because such a policy would not have had the life benefits associated with the Millennium Plan. A directly held policy could also have been less attractive because premium payments on such a policy might not have been deductible to the same extent that the contributions to the Millennium Plan were represented to be.

Petitioners also argue that Goyak & Associates had substantial authority for its deduction of contributions to the Millennium Plan. Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Petitioners believe that the question of whether the Millennium Plan is within the scope of section 419A(f)(6) is a novel question for which there was a paucity of available authorities in 2002, the year petitioners' tax returns were filed. We disagree. Neonatology Associates, P.A. v. Commissioner, supra at 92, makes it clear that deductions to a purported welfare benefit fund are not deductible when that fund operates "as a tax-free savings device for the" participants. Even if the section 419A(f)(6) issue were novel, the issue of whether an expenditure by a close corporation is ordinary and necessary under section

162 or a constructive distribution is not novel. See <u>Neonatology Associates, P.A. v. Commissioner</u>, 299 F.3d at 234-235; <u>Curcio v. Commissioner</u>, T.C. Memo. 2010-115.

We conclude that petitioners' underpayments of tax were the result of their negligence and careless disregard of rules or regulations. We also conclude that petitioners are not entitled to the reasonable cause and good-faith defense because they did not act reasonably in relying on their financial advisers. We therefore hold that petitioners are liable for the 20-percent accuracy-related penalties under section 6662.

V. <u>Conclusion</u>

We hold that the $1.4 million contribution paid by Goyak & Associates to the Millennium Plan was not an ordinary and necessary business expense deductible under section 162(a) but rather a constructive dividend paid to Mr. Goyak, taxable as ordinary income to him. We also hold that petitioners are liable for the 20-percent accuracy-related penalties under section 6662.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.