RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

PETER E. MCGOWAN; MICHELE L. MCGOWAN; PETER
E. MCGOWAN DDS, INC.,

　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

UNITED STATES OF AMERICA,

　　　　　　　　　*Defendant-Appellee*.

No. 24-3228

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:19-cv-01073—James R. Knepp II, District Judge.

Argued:  May 7, 2025

Decided and Filed:  July 9, 2025

Before:  CLAY, READLER, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Samuel J. Lauricia, WESTON HURD LLP, Cleveland, Ohio, for Appellants.  Paul A. Allulis, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Samuel J. Lauricia, Walter A. Lucas, Matthew C. Miller, WESTON HURD LLP, Cleveland, Ohio, for Appellants.  Paul A. Allulis, Clint Carpenter, Francesca Ugolini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  A rambunctious groundhog's turn-of-the-twentieth century antics led to the creation of a Northwest Ohio community treasure and, more recently, a federal tax dispute.  To understand why, turn back the clock to the spring of 1900, when an

overgrown groundhog ran loose in the furniture store of Toledo businessman Carl Hillebrand.  A quandary arose.  On one hand, the marmot posed a grave risk to Hillebrand's inventory.  True to their "woodchuck" alias, groundhogs are known to gnaw on wood, including furniture.  And this one evidently had a penchant for chewing.  Yet on the other hand, Hillebrand, to his credit, did not want to exterminate his furry visitor.

But a solution would soon surface.  As luck would have it, local park officials had a growing interest in opening a zoo.  So Hillebrand offered his pesky patron to a park superintendent, who gladly accepted, and in turn put the animal on display for visitors.

Perhaps like those sizing up tax law at first blush, observers faced some initial confusion.  Onlookers thought they were witnessing a baby bear, not a groundhog, on account of the animal's large size.  Word of the enclosed supposed omnivore quickly spread, with crowds flocking to witness the seeming hog-in-bear's clothing.  The exhibition did gangbusters.  And with that, the Toledo Zoo was launched.  *See* Toledo Stories: *The Toledo Zoo: A Living History*, at 4:23 (PBS television broadcast, aired Oct. 24, 2002).

By any metric, the Zoo has achieved much success over the ensuing century-and-a-quarter.  It has grown to house over 16,000 animals.  *Visit Our Animals*, Toledo Zoo & Aquarium, https://perma.cc/K6DY-5Z7G (last visited July 9, 2025).  It welcomes over one million visitors each year.  *See* Toledo Zoo & Aquarium, *2023 Annual Report* 6 (Aug. 14, 2024), https://perma.cc/96F4-82XB.  And it has garnered accolades.  *See, e.g.*, Press Release, Jen Brassil, Dir. of Pub. Rels. & Commc'ns Events, Toledo Zoo & Aquarium, The Toledo Zoo Honored with the 2023-2024 CILC Pinnacle Award (Aug. 26, 2024, at 4:00 ET), https://perma.cc/HH3P-H3HU (announcing that the Toledo Zoo received the Center for Interactive Learning and Collaboration's Pinnacle Award in recognition of its educational programming efforts).  The Zoo's success has no doubt been fueled by generations of generous donors, all dating back to Hillebrand.

Count Peter McGowan, a Toledo-area dentist, among those altruistic ranks.  For several years, McGown regularly donated to the Toledo Zoo.  Although his contributions waned as his children aged, McGowan purportedly envisioned making another substantial gift later in life:

the cash value of his life insurance policy. The tax ramifications of McGowan's complicated plan to potentially bestow that gift eventually resulted in federal court litigation, and now this appeal.

McGowan's case centers on the following arrangement: Over five years, McGowan's solely owned dental practice, Peter E. McGowan DDS, Inc. (the Company), contributed $50,000 annually to two "subtrusts," one of which owned a life insurance policy covering McGowan. If the policy paid out upon McGowan's death, it would benefit his wife. But if the policy-owning subtrust failed to pay a premium during the policy's life, the subtrust would surrender the policy and transfer all cash value proceeds to the other subtrust. The latter subtrust, in turn, would contribute the money to a charity of McGowan's choice. Like Hillebrand, McGowan chose the Toledo Zoo.

This collection of subtrusts and potential philanthropy was thought to deliver a series of financial benefits to the proclaimed donors. In tax returns McGowan and the Company (collectively, the taxpayers) filed, the Company deducted the policy premiums it paid, with McGowan reporting just a quarter of them as taxable income. But the IRS demurred, asserting that the agency's "split-dollar" regulation required McGowan to include the full value of the policy's economic benefits in his gross income and, separately, foreclosed the Company's attempted deductions. *See* Treas. Reg. § 1.61-22. It accordingly assessed over $100,000 in unpaid taxes, penalties, and interest between the two parties for tax years 2014 and 2015. Litigation ensued, culminating in the district court's award of summary judgment to the government.

Because the taxpayers land firmly within the split-dollar regulation, McGowan must include the value of the policy's economic benefits in his gross income each year, and the Company cannot deduct its annual premium payments. And because that regulation comports with our independent reading of the Internal Revenue Code, *see* I.R.C. §§ 61, 162(a), 419(a), we affirm.

**I.**

McGowan has practiced dentistry for about three decades.  He cut his teeth, so to speak, under a sole proprietorship, which he later incorporated as a C corporation.  Beyond being employed as the Company's only dentist, McGowan also served as its director, president, treasurer, secretary, and sole shareholder.  During the tax years at issue, the Company typically paid McGowan a weekly base salary, plus an end-of-year bonus equaling the Company's otherwise taxable income.

A.  At some point, McGowan, in his own name, purchased a whole life insurance policy from Guardian Life Insurance.  For context, whole-life insurance generally has four key features: it "covers the insured for life," instead of expiring after a fixed term; the insured "pays fixed premiums" throughout his life; a "portion of the premiums" is "invested," allowing the policy to "accumulate[] cash value"; and the insured "receives a guaranteed benefit upon death, to be paid to a named beneficiary."  *Whole-Life Insurance*, Black's Law Dictionary 1110 (12th ed. 2024).

While covered under that policy, McGowan learned of a tax-efficient alternative from his health insurance advisor.  In broad strokes, the new plan (the Plan) involved the Company compensating McGowan with life insurance in a structure intended to replace his Guardian policy and minimize the tax burden across both parties.  It operated through a document called the Benefits Trust Agreement (the Agreement), which established two subtrusts.

One subtrust, labeled the Death Benefit Trust (the DBT), bought and owned a whole-life insurance policy from Penn Mutual covering McGowan (the Policy).  The Policy's terms functioned like his prior policy, save for one nuance:  McGowan, despite being the insured, did not pay the premiums himself.  Rather, the Company contributed $37,222 to the DBT each year, which the DBT then used to pay the Policy's base premium.

The other subtrust was labeled the Restricted Property Trust (the RPT).  The RPT received up to $12,778 from the Company annually, which it would transfer to the DBT.  The DBT, in turn, invested the sums as "paid-up additions" to the Policy's cash value and death benefit.  Benefits Trust Agreement, R. 102-1, PageID#2834.  The DBT, in exchange, gave the

RPT a security interest in the Policy's cash value.  This series of transactions is captured in the following diagram:



The Plan worked in five-year increments.  So long as the DBT satisfied the base premium, the Plan remained effective for a five-year term.  But there are no certainties in life, nor life insurance, and the Plan's structure created three possible endgames.  Each is worth describing.

First, McGowan could die during the Plan's operation.  If he did, the RPT would release its security interest, and Penn Mutual would pay the death benefit to the DBT.  The DBT would then pay that benefit to McGowan's designated beneficiary: his wife.



Second, the Plan could expire, with the Company declining to renew it for another five-year term. If it did, the Plan would terminate, and the Policy would go to McGowan.



Third, during the Plan's life, the Company could fail to contribute the base premium to the DBT. In that instance, the DBT would surrender the Policy for its cash value and transfer the cash to the RPT in satisfaction of its security interest. The RPT would then donate the proceeds to a charity chosen by McGowan: the aforementioned Toledo Zoo.



For simplicity's sake, these descriptions have all excluded one party: Aligned Partners Trust Company, the trustee of both subtrusts. That is because the selected trustee could readily be replaced, in numerous ways. For one, under the Agreement, Aligned Partners had to terminate the trust and transfer the Policy to McGowan if the Company's counsel concluded that a change in tax law justified termination. For another, Aligned Partners and the Company could jointly amend the Agreement "in any manner required to effect [its] purpose and intentions . . . and the transactions contemplated" under it. *Id.*, PageID#2846. And "at any time and for any reason," the Company could "immediately remove" Aligned Partners from its position as trustee "without prior written notice." *Id.*, PageID#2844.

B. With the inner workings of the Plan explained, return to McGowan. Over lunch at a Toledo-area country club, he met with an associate of his health insurance advisor as well as the insurance agent who developed the Plan. The two presented on the Plan's workings. As part of the presentation, McGowan was provided a booklet that weighed the Plan's pros and cons. Notably, every consideration listed therein concerned how the Plan affected McGowan

personally, save for the fact that the Plan purportedly enabled the Company to deduct all its contributions. Also in attendance were an accountant and two attorneys, who together helped McGowan "vet" the "legitimacy" of this "transactional piece" because, in his words, he "d[id not] know tax law." McGowan Dep. Tr., R. 93-1, PageID#1949.

Ultimately, McGowan purchased the Plan for $6,000 in startup fees. He chose the amount of the Policy's death benefit and, in so doing, tried to "maintain" the scope of coverage he had under Guardian. *Id.*, PageID#1977. As a result, the policies' terms were comparable: the Guardian policy had a $2.5-million death benefit and $37,622.64 base premium, while the new Policy had a $2,057,613 death benefit and $37,222.22 base premium.

C. Consistent with the Plan's marketing, McGowan and the Company each took taxpayer-favored positions on their returns. McGowan reported neither the value of the death benefit nor the accumulated cash value of the Policy as taxable income on his returns. But he did report the annual $12,778 contributions to the RPT as income, following a tax election undisputed here. *See* I.R.C. § 83(b). Meanwhile, the Company claimed deductions on its returns each year for $50,000, the sum of its annual payments to the subtrusts.

This arrangement continued for five years, from 2011 through 2015, at which point McGowan tried to extend the Plan. But he missed the deadline to do so. That misstep meant that, as the Plan's terms instructed, McGowan took direct ownership of the Policy in 2016. In his return for that year, he reported that his receipt of the Policy triggered taxable income of $115,227—the then–cash value of the Policy less the sum of the appreciated value of each year's $12,778 RPT contribution, which, recall, had already been reported as income.

Shortly thereafter, the IRS audited McGowan and the Company. At the audit's close, the agency concluded that McGowan should have recognized the Policy's accumulation of cash value as taxable income each tax year, and that the Company should not have been taking deductions for its annual contributions to the DBT. Accordingly, for tax years 2014 and 2015, the IRS assessed additional taxes and penalties: $65,589.80 for McGowan, and $37,164.94 for the Company. (The Plan's first three tax years, as well as the Company's yearly $12,778 deductions for its RPT contributions, are not at issue in this litigation.)

McGowan and the Company paid the assessed taxes and penalties, a requirement to sue in federal district court. *See* 28 U.S.C. § 1346(a)(1); *Flora v. United States*, 362 U.S. 145, 177 (1960). A lawsuit followed. There, the taxpayers raised a flurry of arguments in support of their request to be refunded the additional sums paid. The district court, however, granted summary judgment to the government and later denied the taxpayers' partial motion for reconsideration. *McGowan v. United States*, 694 F. Supp. 3d 992, 1005 (N.D. Ohio 2023); *McGowan v. United States*, No. 19 CV 1073, 2024 WL 1094617, at *6 (N.D. Ohio Mar. 13, 2024). The taxpayers now appeal.

**II.**

We review a district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in favor of the nonmovant—here, the taxpayers. *Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024). Summary judgment is warranted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also* Fed. R. Civ. P. 56(a).

That we view the evidence in favor of the taxpayers here bears emphasis, as it resolves a threshold dispute over burden-shifting. By way of background, we ordinarily presume that the IRS's tax liability determinations are correct, *Welch v. Helvering*, 290 U.S. 111, 115 (1933), meaning a taxpayer bears the burden of proving facts necessary to establish "the amount he is entitled to recover," *United States v. Janis*, 428 U.S. 433, 440 (1976). But "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed," then the government "ha[s] the burden of proof with respect to such issue." I.R.C. § 7491(a)(1).

According to the taxpayers, the district court failed to so shift the burden concerning two purportedly factual issues. But, again, at summary judgment, the district court must draw all reasonable inferences in favor of the nonmovant. *See Matsushita*, 475 U.S. at 587. It did so here, viewing the record in the light most favorable to the taxpayers. *McGowan*, 694 F. Supp. 3d at 997 (citing *Matsushita*, 475 U.S. at 587). In this setting, burden-shifting under § 7491(a)(1) makes no difference, as no material facts are in dispute. *See Burilovich v. Bd. of Educ. of*

*Lincoln Consol. Schs.*, 208 F.3d 560, 567 n.3 (6th Cir. 2000) ("Because we treat this case as submitted on summary judgment, plaintiffs' arguments on appeal as to who bears the burden of proof are irrelevant.").

A. On the merits, much of this litigation centers on the purported authority behind the IRS's assessment, namely, Treasury Regulation § 1.61-22, often labeled the "split-dollar regulation." In the employment context, split-dollar agreements involve an employer contracting with an employee to pay some or all of the premiums on the employee's life insurance, generally in exchange for the parties sharing the policy's benefits. *See, e.g.*, Rev. Rul. 64-328, 1964-2 C.B. 11. In that sense, "dollar[s]" expended on premiums and received as benefits are, on paper, "split" among the company and employee. *See* Tracie Rozhon & Joseph B. Treaster, *Insurance Plans of Top Executives May Violate Law*, N.Y. Times, Aug. 29, 2002, at A1. Many executive compensation packages include iterations of these plans. Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 131–32 (2004).

Indeed, split-dollar agreements have proven so common that the Treasury Department promulgated a regulation in 2003 to address and clarify their taxation. T.D. 9092, 2003-2 C.B. 1055. The regulation concerns three flavors of life insurance plans: general, compensatory, and shareholder. Treas. Reg. § 1.61-22(b)(1)–(2). Each triggers effectively the same tax consequences under the regulation but differs in its qualifying criteria. *See id.* § 1.61-22(a)(1), (b)(1)–(2). This case concerns the compensatory provision, which captures "[a]ny arrangement between an owner and a non-owner of a life insurance contract" in which:

> (A) The arrangement is entered into in connection with the performance of services and is not part of a group-term life insurance plan described in [an irrelevant provision];
>
> (B) The employer or service recipient pays, directly or indirectly, all or any portion of the premiums; and
>
> (C) Either—
>
>> (*1*) The beneficiary of all or any portion of the death benefit is designated by the employee or service provider or is any person whom the employee or service provider would reasonably be expected to designate as the beneficiary; or

> (*2*) The employee or service provider has any interest in the policy cash value of the life insurance contract.

*Id.* § 1.61-22(b)(2)(i)–(ii). If the Plan meets these terms, the split-dollar regulation requires McGowan to recognize the full value of the Plan's economic benefits (minus any consideration he paid to the Company for those benefits) and prohibits the Company from taking deductions for its premiums paid. *Id.* § 1.61-22(d)(1), (f)(2)(ii). The taxpayers do not dispute that the Plan meets subclauses (A) and (B). Yet they give two other reasons why the split-dollar regulation should not apply here.

1. One is tied to the regulation's threshold element: that the "arrangement" at issue be "between an owner and a non-owner of a life insurance contract." *Id.* § 1.61-22(b)(2)(i). According to the taxpayers, because the DBT formally owned the Policy and had an independent trustee, the Company was not "an owner" of the Policy—rendering the Plan an arrangement between two nonowners.

We disagree. The split-dollar regulation elsewhere specifies that an employer "is treated as the owner of the life insurance contract if the owner" of that policy is "[a] welfare benefit fund within the meaning of [I.R.C. §] 419(e)(1)." *Id.* § 1.61-22(c)(1)(iii)(C). Section 419(e)(1), for its part, defines a "welfare benefit fund" as any fund "(A) which is part of a plan of an employer, and (B) through which the employer provides welfare benefits to employees or their beneficiaries." I.R.C. § 419(e)(1). The DBT is just that. As explained in the Agreement, the Plan effectuates the Company's "desire[] to provide certain financial benefits to each employee designated." Benefits Trust Agreement, R. 102-1, PageID#2831. Indeed, in district court, the taxpayers themselves referred to the DBT as a welfare benefit fund. *See* Pls.' Mot. Summ. J., R. 103, PageID#3036 ("Deductions for contributions to welfare benefits funds (*i.e., the DBT*) are deductible . . . ." (emphasis added)).

The taxpayers respond that reading the Agreement in this way improperly conflates the substance of the Plan over its form. In so doing, they remind us that "'[f]orm' *is* 'substance' when it comes to law." *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 782 (6th Cir. 2017). Here, however, it bears reminding that our assessment of form and substance is dictated by the Treasury Regulations that treat a welfare benefit fund as synonymous with the employer. This

approach is consistent with the understanding that "[w]hile taxpayers are free to arrange their affairs to minimize taxes, they must do so in real ways—ways that give a transaction economic teeth and do not merely place tax-avoiding labels on tax-owing transactions." *Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Comm'r*, 924 F.3d 821, 825 (6th Cir. 2019). And here, the form the taxpayers embrace largely amounts to the interposition of an economically meaningless subtrust. Arranging matters in this way does not defeat the Company's ownership rights over the Policy. *See, e.g.*, *Our Country Home Enters., Inc. v. Comm'r*, 145 T.C. 1, 40 (2015) (treating employer as owner of life insurance policy held by trust). Nor does the involvement of an ostensibly independent trustee change this analysis, when the Company could replace that trustee "at any time and for any reason." Benefits Trust Agreement, R. 102-1, PageID#2844.

The taxpayers' remaining points on this front warrant little response. They analogize their appeal to the circumstances posed in a recent IRS-penned technical advice memorandum. Yet such documents "have no precedential value to parties other than the taxpayer they are issued to." *Fitzgerald Truck Parts & Sales, LLC v. United States*, 132 F.4th 937, 945 (6th Cir. 2025) (internal quotation marks omitted); *see also* I.R.C. § 6110(k)(3) (barring such memoranda from being "used or cited as precedent"). Besides, the memorandum at issue dealt with an alleged split-dollar arrangement wherein employees did "not receive any direct benefit" from the insurance, unlike McGowan here. I.R.S. Tech. Adv. Mem. 200511015 (Mar. 18, 2005). The taxpayers also allege that the IRS, in prior lawsuits against different taxpayers, has argued other split-dollar arrangements either did "not provid[e] welfare benefits in furtherance of a business purpose or in substance were not welfare benefit plans." Appellants' Br. 32. Yet the only case cited by the taxpayers involved an iteration of the welfare benefit plan that is not at issue here. *See* I.R.C. § 419A(f)(6) (carveout for "10 or more employer plan[s]"); *Goyak v. Comm'r*, 103 T.C.M. (CCH) 1082, 2012 Tax Ct. Memo LEXIS 13, at *6 (Jan. 11, 2012) (involving such a plan). What is more, the allegedly conflicting prior argument derived from expert testimony introduced by the *taxpayer* there, not by the government itself. *See Goyak*, 103 T.C.M. (CCH) 1082, 2012 Tax Ct. Memo LEXIS 13, at *25.

2. The taxpayers next take issue with subclause (C) of § 1.61-22(b)(2)(ii). To their minds, the Plan satisfies neither of subclause (C)'s two conditions, a showing the taxpayers must

make to avoid being subject to the split-dollar regulation. *See* Treas. Reg. § 1.61-22(b)(2)(iii) (indicating that a taxpayer meets the requirements of subclause (C) if "[e]ither" condition is satisfied). But this argument is a nonstarter. Subclause (C)(*1*) is met if "[t]he beneficiary of all or any portion of the death benefit is designated by the employee." Treas. Reg. § 1.61-22(b)(2)(ii)(C)(*1*). That describes the Plan to a tee: "the employee"—McGowan—"designated" his wife as "[t]he beneficiary of all . . . of the death benefit." *See id.* And with the taxpayers falling under subclause (C)(*1*), the split-dollar regulation governs the Plan, regardless whether subclause (C)(*2*) also applies.

The taxpayers' effort to avoid this conclusion brings the venerable Toledo Zoo into the picture, as their argument that subclause (C)(*1*) is not met hinges on the Zoo's role in the Plan. According to the taxpayers, the possibility of the DBT's cash value being donated to charity under the Plan—should the Company fail to contribute the base premium to the DBT—prevents our conclusion that McGowan designated the relevant beneficiary. But that possibility makes no difference, for at least three reasons. One, the charity has an interest in the Policy's *cash value*, not its death benefit, the relevant consideration under subclause (C)(*1*). Two, with respect to the death benefit itself, McGowan designated his wife as the recipient (regardless of any possibility that this benefit would never materialize). And three, even assuming a charity had an interest in the death benefit, McGowan still designated the charity beneficiary: the Toledo Zoo.

Technically, the taxpayers remind us, the Policy's death benefit is paid first to the DBT, which was not designated by McGowan, at which point it is transferred to his wife. But this structuring deserves little heed. *See Hawk*, 924 F.3d at 825. Remember, the DBT "shall distribute and pay" the death benefit "to [McGowan's] beneficiary" upon his death. Benefits Trust Agreement, R. 102-1, PageID#2837. The word "shall" signals an obligation. *See, e.g.*, *Bufkin v. Collins*, 145 S. Ct. 728, 737 (2025) ("'Shall' means 'must.'"). In economic reality, then, the Plan enabled McGowan to select his wife as the ultimate beneficiary of his life insurance policy's death benefit—subtrust intermediary notwithstanding. *See, e.g.*, *Our Country*, 145 T.C. at 44–45 ("The fact that the death proceeds from the life insurance policies are funneled through [an intermediary] to each of the ultimate recipients does not blur our view (or our conclusion) that each of those recipients is the beneficiary of the death benefit . . . .").

B.  Even assuming the split-dollar regulation applies, the taxpayers say McGowan did not understate gross income during the at-issue tax periods because those periods occurred before the alleged point of vesting, that is, when he took direct ownership of the Policy.  By way of background, under the regulation, McGowan's taxable income must include the "full value of all economic benefits" derived from the Plan.  Treas. Reg. § 1.61-22(d)(1); *see also id.* § 1.61-22(a)(1).  The Treasury defines that phrase to comprise three inputs:

> (i)  The cost of current life insurance protection . . .
>
> (ii) The amount of policy cash value to which the non-owner has current access within the meaning of paragraph (d)(4)(ii) . . . ; and
>
> (iii) The value of any economic benefits not described in [subparts] (i) or (ii) . . . .

*Id.* § 1.61-22(d)(2).  The taxpayers contest clause (ii).  They reason that McGowan, a "non-owner," lacked "current access" to the "policy cash value" because he had the potential to enjoy such value only in the future, subject to the risk of loss from a potential forced donation to charity.

The problem for the taxpayers is that the regulation expressly defines "current access" in a somewhat counterintuitive manner to include "future right[s]":

> For purposes of this paragraph (d), a non-owner has current access to that portion of the policy cash value—
>
>> (A) To which, under the arrangement, the non-owner has a current or future right; and
>>
>> (B) That currently is directly or indirectly accessible by the non-owner, inaccessible to the owner, or inaccessible to the owner's general creditors.

*Id.* § 1.61-22(d)(4)(ii).  This articulation, of course, trumps any plain meaning otherwise assigned to "current access."  *Id.* § 1.61-22(d)(2)(ii); *see, e.g.*, *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018).  Even still, the taxpayers quarrel with both halves of the definition.  Each deserves its turn.

1.  Start with subclause (A), and whether McGowan, as the "non-owner," in fact "has a current or future right" in the Policy's cash value.  Treas. Reg. § 1.61-22(d)(4)(ii)(A).

The Agreement reflects that McGowan enjoyed several such current or future rights: his right to receive the Policy upon the Company's nonrenewal, his right to designate the beneficiary of the Policy's death benefit, and his right to designate the charity potentially receiving the cash value.

Seeing things otherwise, the taxpayers characterize the potential donation of the cash value to charity as a "substantial risk of forfeiture" that rids McGowan of any "current or future right[s]." Appellants' Br. 38–39. Yet how, one might ask, does the phrase "substantial risk of forfeiture" govern our split-dollar analysis? After all, the phrase appears nowhere in the regulation. It instead hails from an unrelated Internal Revenue Code provision. *See* I.R.C. § 83(a)(1) (taxing market value of property received for services if property is "not subject to a substantial risk of forfeiture"). And that unrelated provision's regulations, it bears adding, redirect the "taxation of life insurance protection under a split-dollar life insurance arrangement" to, well, the split-dollar regulation itself. Treas. Reg. § 1.83-1(a)(2).

In any event, the Plan's potential donation to charity itself forms a "current or future right" for McGowan. He presumably derives some intrinsic value from money being sent to the beneficiary he selected, the Toledo Zoo, his longtime charitable interest, rather than a charity outside of his purview, say, an animal rights group against zookeeping. *Cf. Helvering v. Horst*, 311 U.S. 112, 118 (1940) ("The power to dispose of income is the equivalent of ownership of it. The exercise of that power to *procure the payment of income to another* is the enjoyment and hence the realization of the income by him who exercises it." (emphasis added)).

2. As for subclause (B), because the Policy's cash value satisfied one of the three disjunctive factors listed—it was "inaccessible to [its] owner," the Company (through the DBT, *see* Treas. Reg. § 1.61-22(c)(1)(iii)(C))—this subclause is likewise met. *Id.* § 1.61-22(d)(4)(ii)(B). On this point, the Agreement rendered the DBT irrevocable and barred the Company from receiving any portion of the cash value. One clause, for example, stated that "[a]t no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, purposes other than for the sole and the exclusive benefit of [McGowan], [his] designated beneficiaries, or a designated charitable organization." Benefits Trust Agreement, R. 102-1, PageID#2845. Another provided that "[n]one of the benefits, payments, proceeds, claims or rights of [McGowan] shall be subject to anticipation, alienation, sale, transfer, assignment,

pledge, encumbrance or charge by any person or entity." *Id.* These provisions may explain why the taxpayers themselves asserted in district court that "the cash value could not be accessed by anyone. Period." Pls.' Opp'n Def. Mot. Summ. J., R. 105, PageID#3369.

\* \* \*

Taking stock of matters, the split-dollar regulation makes clear the tax consequences for each taxpayer: McGowan was required to "take into account the full value of all economic benefits" from the Plan when calculating his gross income for tax years 2014 and 2015. Treas. Reg. § 1.61-22(d)(1). And the Company was prohibited from deducting its payments to the DBT during these years, as "[n]o premium or amount described in [§ 1.61-22(d)] is deductible by the owner" of the life insurance policy. *Id.* § 1.61-22(f)(2)(ii). Until being assessed by the IRS, however, neither party satisfied their respective obligation.

C. As a final salvo, the taxpayers invoke the groundbreaking decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411–12 (2024), overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). According to the taxpayers, had the district court applied the now-governing *Loper Bright* standard, or had it simply correctly applied *Chevron* deference, it would have concluded that the split-dollar regulation contravened Congress's commands in the Internal Revenue Code. Because the taxpayers make this argument for the IRS's assessments of both McGowan and the Company, we analyze the statutory authority behind each.

1. Starting with McGowan, the taxpayers allege that the district court cited no statutory authority "in holding [McGowan] was subject to tax in 2014 and 2015." Appellants' Br. 18. That assertion, while superficially true, derives more from two irredeemable flaws in the taxpayers' argument—one procedural in nature, the other on the merits—than it does any oversight by the district court.

On procedure, the taxpayers failed to preserve this interpretive question regarding the validity of McGowan's taxation in district court, as they first made their *Chevron* (and, ergo, *Loper Bright*) challenge in moving for reconsideration. "Arguments raised for the first time in a motion for reconsideration are untimely and forfeited on appeal." *Evanston Ins. v. Cogswell*

*Props., LLC*, 683 F.3d 684, 692 (6th Cir. 2012). The taxpayers' briefing on appeal makes no effort to explain away this deficiency, which is likewise fatal to any argument that the intervening decision in *Loper Bright* justifies setting aside their forfeiture. *See S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 718 (6th Cir. 2023).

As to the merits, the statutory authority behind the split-dollar regulation is readily apparent. Internal Revenue Code § 61(a) states that "[e]xcept as otherwise provided in th[e subtitle on income taxes,] gross income means all income from whatever source derived." I.R.C. § 61(a); *see also* Alice G. Abreu & Richard K. Greenstein, *Defining Income*, 11 Fla. Tax Rev. 295, 343 (2011) ("[T]he study of tax begins with what is income, and that . . . leads directly to [§] 61 . . . ."). That provision tracks the language of the Sixteenth Amendment, *see* U.S. CONST. amend. XVI, because "Congress intended through § 61(a) and its statutory precursors to exert 'the full measure of its taxing power,' and to bring within the definition of income any 'accessio[n] to wealth.'" *United States v. Burke*, 504 U.S. 229, 233 (1992) (alteration in original) (citations omitted). In that way, the statute "is broad enough to include in taxable income any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected." *Comm'r v. Smith*, 324 U.S. 177, 181 (1945). So even though compensatory split-dollar arrangements look superficially different than, say, biweekly paychecks, both involve an employer conferring wealth onto an employee "as compensation." *Id.* That fact alone suffices for the split-dollar regulation to comport with § 61(a). And the taxpayers, for their part, cite no other Code provision that exempts or excludes the premiums from McGowan's gross income. So with only the capacious language of § 61(a) at issue, the split-dollar regulation falls within that provision.

2. Turning to the Company, the taxpayers allege that the split-dollar regulation impermissibly forecloses deductions that the Company otherwise could have claimed under the Internal Revenue Code. Alternatively, they frame this argument as a broad-based challenge to the regulation's validity under *Loper Bright*.

Either way, the taxpayers face an immediate textual hurdle: Internal Revenue Code § 419(a) prohibits deductions for "[c]ontributions paid or accrued by an employer to a welfare benefit fund" unless "they would otherwise be deductible." I.R.C. § 419(a). And as income tax

deductions have long been deemed "matter[s] of legislative grace," the taxpayers must "clearly show[] the right to the[ir] claimed deduction." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (quoting *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593 (1943)); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 643 n.2 (1980) (Rehnquist, J., dissenting) (reciting how exemptions and deductions are "matter[s] of legislative grace" that require an affirmative enactment from Congress).

On this point, the taxpayers cite a statute that, in their view, permits the deductions attempted here: Internal Revenue Code § 162(a). That provision provides a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." *Id.* § 162(a). Satisfying the provision requires demonstrating five elements: "[A]n item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *INDOPCO*, 503 U.S. at 85 (quoting *Comm'r v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971)). Neither party disputes the first and third elements, so this argument hinges on whether the premiums formed "ordinary" and "necessary" "trade or business" expenses. Helpfully, the Supreme Court has supplied some definitions. To qualify as "ordinary," an expense "must be of common or frequent occurrence in the type of business involved." *Deputy v. du Pont*, 308 U.S. 488, 495 (1940). "[N]ecessary," by contrast, wields a more counterintuitive definition: it imposes "only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" *Comm'r v. Tellier*, 383 U.S. 687, 689 (1966) (alteration in original) (quoting *Welch*, 290 U.S. at 113). And "trade or business" requires that any activities be "engag[ed] in" with the "primary purpose" of generating "income or profit." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987).

The premiums fall outside these conditions. Far from being commonplace among dentists or promoting the Company's inherent profit motive, the premiums served merely to advance McGowan's personal goal of leaving a beneficiary of his choice (who need not be related to the Company) over $2 million, no strings attached, in an attempted tax-efficient vehicle. One glance at the Plan's marketing confirms as much. Among its slate of alleged benefits, just one concerned the Company: tax-deductible contributions. Yet tax avoidance alone

does not suffice for a "trade or business" expense under § 162(a). *See, e.g.*, *du Pont*, 308 U.S. at 493 (explaining that business activities require "a bona fide business purpose," which does not encompass "tax avoidance"); *Hayden v. Comm'r*, 889 F.2d 1548, 1552 (6th Cir. 1989) (explaining how profit motive must be "independent of tax savings"). Accordingly, the taxpayers fall well short of "clearly showing" that the Company qualified for § 162(a) deductions. *INDOPCO*, 503 U.S. at 84 (citation omitted).

Resisting this conclusion, the taxpayers cite two alleged business goals behind the Plan: (1) ensuring business continuity and (2) motivating McGowan to remain with the Company. The record belies each. For example, if the Policy was intended to ensure the Company's survival after McGowan's death, why did the parties choose a death benefit based on McGowan's "insurability" and prior personal life insurance, rather than the cost of finding a successor dentist? That latter expense, according to McGowan's accountant, runs an estimated $150,000 to $200,000—less than one-tenth of the death benefit here. Likewise, why would the allegedly business-continuing Policy forcibly donate its cash value to charity should the Company fail to pay its annual premiums? If the Company faced financial distress to such an extent that it could not make the $37,222 payments each year, its survival prospects presumably would increase by receiving the Policy's cash value. And as to motivation, McGowan needed no "incentive to remain with the [Company]." Benefits Trust Agreement, R. 102-1, PageID#2831. He is, remember, its sole owner. *See Curcio v. Comm'r*, 689 F.3d 217, 227 (2d Cir. 2012) ("[Taxpayers] cannot claim that they enrolled in the Plan to incentivize or retain themselves as employees, as they were the owners of the businesses.").

To be sure, employer-provided life insurance can (and frequently does) form a deductible business expense in other contexts. *See id.* at 226. The problem for the taxpayers is that the Plan did not "compensate, incentivize, and retain key employees," but instead formed an "investment" and "estate planning . . . vehicle[]" for the sole benefit of the owners of the company." *Id.* (internal citation and quotation marks omitted). With respect to this conclusion, every on-point sister circuit and Tax Court precedent agrees. *See, e.g.*, *id.*; *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 223–24 (3d Cir. 2002) (denying § 162 deductions because shareholder-employees had "adopted a specially crafted framework to circumvent the intent and provisions of

the Internal Revenue Code by having their corporations pay inflated life insurance premiums so that the excess contributions would be available for redistribution to the individual shareholders free of income taxes"); *V.R. DeAngelis M.D.P.C. v. Comm'r*, 94 T.C.M. (CCH) 526, 2007 WL 4257483, at *23 (2007) (denying § 162 deductions for employee-owned employers because "employees are not allowed to disguise their investments in life insurance as deductible benefit-plan expenses when those investments accumulate cash value for the employees personally"), *aff'd* 574 F.3d 789 (2d Cir. 2009) (per curiam).  At day's end, the Plan served only as a means for McGowan and his wife to extract value from the Company, without any corresponding benefit to the dentistry business.

## III.

At various points, the parties' briefs invoke our decision in *Machacek v. Commissioner*, 906 F.3d 429 (6th Cir. 2018).  A few words, then, on that case.  There, we analyzed a split-dollar life insurance arrangement entered between a shareholder-employee and his employer, an S corporation.  *Id.* at 430.  After noting that the policy qualified as a "compensatory" (and not a "shareholder") arrangement under the split-dollar regulation, *id.* at 433, *Machacek* nevertheless reasoned that the shareholder-employee should have been taxed as if he received a shareholder distribution rather than services-based compensation, *id.* at 436.  For support, it cited a regulation to a different Internal Revenue Code section, one that reads "the provision by a corporation to its shareholder pursuant to a split-dollar life insurance arrangement . . . is treated as a distribution of property."  Treas. Reg. § 1.301-1(m)(1)(i)(as amended 2021); *see also* T.D. 9954, 86 Fed. Reg. 52,612, 52,614 (Sept. 22, 2021) (changing the location of this language).  Based on this language, *Machacek* set forth a broad and categorical holding: whenever "a shareholder receives economic benefits from a split-dollar arrangement"—even those deemed "compensatory"—the "benefits [must] be treated as a distribution of property to a shareholder."  *Machacek*, 906 F.3d at 436.

What does all this have to do with the taxpayers here?  Well, by characterizing his income from the Plan as a shareholder distribution (and, ultimately, a qualified dividend) rather than services-based compensation, McGowan is taxed at capital gains rates, which are usually far lower than ordinary income rates.  *See* I.R.C. §§ 301(c)(1), 316; *Mulcahy, Pauritsch, Salvador*

*& Co. v. Comm'r*, 680 F.3d 867, 869–70 (7th Cir. 2012) (Posner, J.) (observing "substantially lower maximum rate" for dividends).  Indeed, the parties have stipulated to this very treatment should we not overrule *Machacek*.  This means that, despite our holding for the government, McGowan is entitled to a $40,978.07 refund (plus interest) because the IRS had originally assessed his tax deficiency on the premise that the Plan triggered ordinary income.

*Machacek*, it bears adding, implicates more than just the shareholder-employee's returns.  One could fairly read the decision to require an employer similarly to treat split-dollar life insurance arrangements as nondeductible shareholder distributions rather than oft-deductible employee compensation.  *See Mulcahy*, 680 F.3d at 869 (contrasting the employer's tax treatment of compensation from that of dividends).  The government, in fact, recognizes this alternative and seemingly straightforward route to affirm the nondeductibility of the Company's premiums.  Yet it allocates just two sentences of briefing to the matter.

Such fleeting mention is understandable.  After all, *Machacek* stands in tension with, and possibly contradicts, the Internal Revenue Code.  To that end, § 301(a)—the statutory hook for the regulation *Machacek* analyzed—applies only to "distribution[s] of property . . . made by a corporation to a shareholder *with respect to its stock*."  I.R.C. § 301(a) (emphasis added); *see also* Treas. Reg. § 1.301-1(d) ("Section 301 is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in the shareholder's capacity as such.").  And for shareholder-employees like Machacek and McGowan, it is possible to differentiate payments tied to their stock from payments tied to their services, with the latter falling "outside the scope of [§] 301." *De Los Santos v. Comm'r*, 156 T.C. 120, 130 (2021) (reviewed decision) (recognizing that a shareholder can be paid in "his capacity as an employee or a lender"); *see also* Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 8.06[1], at 8-36 to 8-37 (7th ed. 2013) (listing more examples that fall beyond § 301(a), such as "payments . . . to a shareholder-vendor as payment for property[] and to a shareholder-lessor as rent for the use of property").  By categorically holding that split-dollar life insurance plans involving shareholder-employees always concern the shareholders' stock, *Machacek* seemingly overlooks the possibility that such plans could relate to services or other non-stock categories.

Tax experts share this skepticism. Consider first the IRS. After *Machacek*, the agency issued a "nonacquiescence letter" signifying that it disagreed with our holding and would therefore refuse to follow it outside the Sixth Circuit. *Machacek*, 906 F.3d 429, *action on dec.*, 2021-02 (May 24, 2021) ("Payments that arise from an employer-employee relationship, like those in *Machacek*, are compensation, not distributions subject to [§] 301."); *see also Actions on Decisions (AOD)*, IRS, https://perma.cc/BJP7-ZTM5 (last visited July 9, 2025) (listing that, since 1997, just three Sixth Circuit opinions have resulted in such a letter). Tax academics have been equally blunt in their assessment: "*Machacek* completely missed the boat in holding that all split-dollar arrangements . . . involving a shareholder (even in an employer-employee situation) . . . [are] required to be treated as a distribution of property . . . ." Blaise M. Sonnier & Irana Scott, *Split Dollar Life Insurance: Back to Basics*, 136 J. Tax'n 13, 21 (2022). Perhaps most damning of all, the Tax Court—in a published decision joined by all sixteen then-active judges—concluded, "[w]ith all due respect," that the court was "unable to embrace the reasoning or result of the Sixth Circuit's opinion in *Machacek*." *De Los Santos*, 156 T.C. at 130.

*Machacek*'s sun may soon set. The decision operated under the background principle of *Chevron* deference, which required the panel to "mechanically afford *binding* deference to agency interpretations." *Loper Bright*, 603 U.S. at 399. Now that *Loper Bright* commands "courts [to] exercise independent judgment in construing statutes," *id.* at 406, we must apply the plain meaning of § 301(a) over any contradictory reading ostensibly set forth by the Treasury in § 1.301-1(m)(1)(i). And, of course, regulations cannot amend a statute, *see Koshland v. Helvering*, 298 U.S. 441, 447 (1936), or "add[] to the statute . . . something which is not there," *United States v. Calamaro*, 354 U.S. 351, 359 (1957). Because neither party here has asked us to reconsider *Machacek*, however, we defer doing so to another case.

\* \* \* \* \*

We affirm.